IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| PAMELA L. RANEY, | CASE NO. 5:22-cv-1720 |
| Plaintiff, | DISTRICT JUDGE PAMELA A. BARKER |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Pamela Raney filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits and Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court reverse the Commissioner's decision and remand for proceedings consistent with this opinion.

**Procedural history**

On March 20, 2017, Raney filed an application for Disability Insurance Benefits alleging a disability onset date of March 4, 1017,[1] and claiming she

---

[1]    "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

was disabled due to fibromyalgia, history of breast cancer, chronic migraines, and pain throughout her body. Tr. 167–68, 304. The Social Security Administration denied Raney's application and her motion for reconsideration, and Raney requested a hearing before an Administrative Law Judge (ALJ). Tr. 167, 183, 219.

In February 2019, an ALJ held a hearing. Raney and a vocational expert testified. Tr. 125–66. In April 2019, the ALJ issued a written decision finding that Raney was not disabled. Tr. 15–24. Raney appealed, and about a year later the Social Security Appeals Council declined further review. Tr. 1–3. Raney appealed to federal court, and in June 2021, the court remanded Raney's case back to the Agency. Tr. 1604.

Meanwhile, in May 2020, Raney filed a new application for Disability Insurance Benefits and an application for Supplemental Security Income. Tr. 1642. The Appeals Council issued a remand order in December 2021, consolidating Raney's applications. Tr. 1640, 1642. In April 2022, a different ALJ held an administrative hearing. Raney and a vocational expert testified. Tr. 1424–70. On May 31, 2022, the ALJ issued a partially favorable decision finding that Raney was not disabled from March 4, 2017, through March 11, 2022, but that Raney became disabled beginning on March 12, 2022. Tr. 1394–1412.

Raney appealed to this Court on September 26, 2022.[2] Doc. 1. She asserts the following assignments of error:

> 1. Did the ALJ err at Step Three by not finding that Plaintiff met Listings 12.04 or 12.06?
>
> 2. Did the ALJ err by failing to appropriately weigh Plaintiff's treating providers' opinions?
>
> 3. Did the ALJ err by failing to adequately consider all of Plaintiff's interventions due to her pain, resulting in an RFC that is not supported by substantial evidence?

Doc. 8, at 1.

**Evidence**

*1. Personal and vocational evidence*

Raney was born in 1967 and was 49 years old on her alleged disability onset date. Tr. 22. She has at least a high school education and used to work as a salesperson and a radiological technician. Tr. 1407.

*2. Medical evidence[3]*

In January 2017, Raney had a bone scan due to her history of breast cancer. Tr. 501. The scan showed "persistent increased osteoblastic activity

---

[2]     The ALJ's decision became final when Raney filed a Complaint in this Court. When a federal court remands a case to the Social Security Administration, the subsequent ALJ's decision becomes the final decision where, as here, a claimant does not appeal that decision to the Appeals Council. *See* 20 C.F.R. § 416.1484(a), (d).

[3]     Both parties string-cite medical records covering large periods of time—sometimes more than a year. *See, e.g.*, Doc. 8, at 8 (Raney's brief string-citing 54 treatment records from Raney's visits to the Spine and Pain Institute from October 2020 through February 2022); Doc. 10, at 4 (Commissioner's brief

involving the right lateral aspect of the upper cervical spine," unchanged from Raney's 2014 scan, that "likely represent[ed] degenerative changes." Tr. 501.

In early March 2017, Raney went to the Spine and Pain Institute for neck pain that radiated into the back of her head, around her ear, and into her trapezius muscles. Tr. 763. She received cervical spine facet radiofrequency ablation, which she received before "and [had] done well with." Tr. 763, 766. Raney also reported blurred and double vision, tingling, headaches, depression, nervousness, and anxiety. Tr. 763. Raney's cervical spine exam showed that Raney had a decreased range of motion and tenderness. Tr. 765. She had no weakness and a normal gait. Tr. 765. Later that month, Raney also reported pain in her lower back and had a decreased range of motion, tenderness, pain, and spasm in her cervical and lumbar spine. Tr. 781. Raney had a normal gait and reflexes. Tr. 782.

In June 2017, Raney saw Henry Vucetic, M.D., at the Spine and Pain Institute for a right-sided radiofrequency denervation for her chronic neck pain. Tr. 837–40. Two weeks later, Raney returned for a left-sided radiofrequency denervation. Tr. 847. Both times, Raney denied blurred vision,

---

string-citing eight medical records and a collection of findings from September 2017 to November 2018). Some of the parties' stated exam findings are described as "and/or" and "at times," meaning that not all the string-cited records include all of the findings listed by the parties. *See* Doc. 8, at 8; Doc. 10, at 4. Both parties have failed to comply with my Initial Order, which states, "[e]very fact asserted in the *Facts* section must be supported by citation to an exact and specific transcript page number." Doc. 4, at 3. I have primarily summarized the medical evidence that the parties presented in compliance with my order.

dizziness, tingling, weakness, headaches, and depression. Tr. 837, 847. Dr. Vucetic assessed cervical spondylosis without myelopathy or radiculopathy. Tr. 839, 849.

Also in June 2017, Raney saw Gary Sipps, Ph.D., for a psychological consultative exam. Tr. 803. When asked about her then-current disability, Raney stated that "[her] body can't function and [she] can't deal with it." Tr. 804. In terms of daily activities, Raney helped her mother, visited her boyfriend, spent time relaxing with her cats, watched television, and listened to the radio. Tr. 804. Raney maintained "social interaction" with friends in Louisiana, where Raney lived for 25 years. Tr. 804. She dusted and vacuumed her living space and used an "automatic vacuum cleaner which she does not need to push." Tr. 804. Dr. Sipp wrote that Raney was cooperative, pleasant, and maintained eye contact throughout the exam. Tr. 805. Raney's speech was normal, clear, and coherent. Tr. 805. Raney had intact association. Tr. 805. She had a subdued affect and overt signs of anxiety—she fidgeted with her hands and feet. Tr. 805. Raney reported moodiness but denied verbal angry outbursts and crying spells. Tr. 805. Dr. Sipps diagnosed Raney with major depressive disorder with mild anxious distress. Tr. 806. Dr. Sipps concluded that Raney "would not appear limited" in her ability to understand instructions, remember basic instructions, and perform simple tasks. Tr. 806–07. Raney would have difficulty with multi-step tasks. Tr. 807. She "would not appear limited" in her ability to respond appropriately to supervisors and co-workers in a work

5

setting and to respond appropriately to typical and expected work stressors. Tr. 807.

In August 2017, Raney saw a certified nurse practitioner at the Spine and Pain Institute for a follow-up and to receive a refill of Raney's medications. Tr. 859. Raney reported "about 50% improvement" from her radiofrequency ablations and stated that her medications "provide adequate analgesia," which allowed her to maintain her activities of daily living. Tr. 859. Raney reported back and neck pain, dizziness and tingling, depression, and nervousness and anxiousness. Tr. 860. She denied weakness and headaches. Tr. 859. Upon exam of her cervical and lumbar spine, Raney had a decreased range of motion, tenderness, pain, and spasm. Tr. 862. She had a normal gait and reflexes, no weakness, and a normal straight leg raise test.[4] Tr. 862. Raney's mood, memory, affect, and judgment were normal. Tr. 862.

In November 2017, Raney went to the Spine and Pain Institute and reported doing "ok overall." Tr. 920. Raney reported that her "left neck is very locked up and she has limited [range of motion]." Tr. 920. "She ha[d] done [physical therapy], chiropractic, TPIs, RFA and ESIs and the left neck pain just will not go away." Tr. 920. Raney was feeling more pain down her left arm. Tr. 920. She reported dizziness, weakness, headaches, and depression. Tr. 920.

---

[4]     In a straight leg-raising test, the patient lies down, fully extends the knee, and lifts the leg. *See* Dorland's Illustrated Medical Dictionary, 33rd Edition, 2020, at 1871. Leg pain when raising the leg 30–90 degrees is a positive test and indicates lumbar radiculopathy. *Id*.

Raney's exam findings showed cervical and lumbar spine tenderness, pain, spasms, and decreased range of motion. Tr. 922. She had no weakness and a normal gait and reflexes. Tr. 922.

In May 2018, Raney answered questions for a spine pain questionnaire at the Spine and Pain Institute. Raney reported that pain prevented her from lifting heavy weights, but she could manage light or medium weights if the weight was conveniently positioned, such as on a table. Tr. 1003. Pain prevented her from walking more than 100 yards. Tr. 1003. She could sit in her favorite chair for as long as she liked. Tr. 1003.

In August 2018, Raney participated in the Cleveland Clinic Chronic Pain Rehabilitation program. Tr. 1127. Raney reported generalized body pain, worse in her mid- and upper-back. Tr. 1127. Raney completed a depression questionnaire and her score indicated that she suffered from severe depression. Tr. 1139. Raney's pain disability questionnaire indicated that Raney had an extreme disability. Tr. 1139. On an objective function test, Raney had reduced strength in her arms and reported tingling or numbness in her hands. Tr. 1160. She lifted and carried ten pounds but couldn't lift more than that due to increased pain. Tr. 1160–61. She had poor body mechanics. Tr. 1160. Occupational therapy was recommended. Tr. 1161. Raney had a physical therapy evaluation and reported thoracic and cervical spine pain and associated headaches. Tr. 1186. She reported spending almost the whole day in bed most days of the week. Tr. 1168. An exam showed that Raney had a

7

mildly antalgic gait and normal balance. Tr. 1169. She had tenderness to palpation in her cervical and thoracic spine, minimal to major limitations of cervical spine movements, and pain during thoracic movements. Tr. 1169–70.

Raney continued treatment and therapy at the Cleveland Clinic Center for Chronic Pain. In mid-September 2018, an occupational therapy note indicated that Raney had reduced shoulder strength. Tr. 1307. Raney's body mechanics were noted to be "much improved" and Raney's daily activity level had increased. Tr. 1307. A few days later, Raney completed the Chronic Pain Rehabilitation Program. Tr. 1361.

In November 2018, Raney saw Mary Patterson, APRN, CNP, for a follow-up after completing the Chronic Pain Rehabilitation Program. Tr. 1361. Patterson summarized Raney's condition upon discharge from the program. Tr. 1361–62. Raney improved from physical therapy—her pain behavior score decreased from "7.5/10" to "4/10," her gait was normal, and her walking, standing, and climbing test results had improved. Tr. 1361. Her ability to lift remained at ten pounds. Tr. 1361. Patterson wrote that Raney's pain was "in much better control." Tr. 1362. Raney's cervical spine radiofrequency ablation from September and October was providing her "good benefit." Tr. 1362. Raney's mood was good. Tr. 1362. Raney hadn't followed-up with psychotherapy "as she is trying to get used to the 'new me.'" Tr. 1362. She struggled with memory and time-management. Tr. 1362. Her medications were helping. Tr. 1362. Raney's subjective pain questionnaire suggested a

severe functional impairment and her patient health questionnaire suggested severe depression.[5] Tr. 1370.

The next day, Raney visited Portage Family Medicine to establish care and saw Brittney Jergovich, D.O. Tr. 1066. Raney denied weakness, dizziness, headaches, numbness, tingling, anxiety, and mood changes. Tr. 1067. Upon exam, Raney was in no acute distress and was "well-appearing." Tr. 1067. She had a normal range of motion, no weakness, and normal coordination. Tr. 1067. Raney's attitude was cooperative and Raney had clear and fluent speech and a normal attention span. Tr. 1068.

On February 19, 2019, Licensed Professional Counselor Jillya Collica completed a Mental Health Residual Functional Capacity form on Raney's behalf. Tr. 1380–84. Collica stated that she began treating Raney that day. Tr. 1380. She wrote that Raney had persistent depressive disorder and post-traumatic stress disorder (PTSD). Tr. 1380. Collica checked boxes indicating that in a work environment Raney could never or rarely interact with the public, co-workers, or supervisors. Tr. 1380. Raney would have "weekly" issues responding appropriately to work criticism and would need weekly extra reminders to complete tasks. Tr. 1380. The form presented criteria that tracked the requirements for Listing 12.04, bipolar and related disorders; Listing 12.06, anxiety and obsessive-compulsive disorders; and Listing 12.15,

---

[5]     While the second page of the treatment note recites these scores, Tr. 1362, the last page of the note states that the questionnaires were bypassed and the responses listed were from August 2018, Tr. 1370.

trauma- and stressor-related disorders.[6] Tr. 1381–83. Collica checked boxes indicating that Raney satisfied all of the criteria, including "extreme" limitations in her ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. *Id*. Collica stated that Raney would miss work more than three times per month and be off task more than 15 percent of the time. Tr. 1384. On February 27, Nurse Patterson signed her name under Collica's name on the final page. Tr. 1384. Patterson also indicated that she disagreed with Collica's finding that Raney could rarely or never interact with the public, co-workers, and supervisors. Tr. 1380. Patterson wrote that Raney could occasionally interact with the public, co-workers, and supervisors. Tr. 1380.

On February 27, 2019, Raney saw physical therapist Miljan Cecez for a functional capacity evaluation at the Cleveland Clinic Rehabilitation and Sports Therapy department. Tr. 1385–86. Cecez wrote that Raney "put forth full effort" during the exam. Tr. 1386. Cecez opined that Raney could perform sedentary level work and couldn't work full-time because she can only work for "up to 5 hours and 16 minutes" per day "while taking into account her need to alternate sitting and standing." Tr. 1386. Raney couldn't sit for more than 2

---

[6]     The "listings" are found at 20 C.F.R Part 404, Subpart P, App. 1. They are a catalog of disabling impairments organized by "body systems." Generally, each body system section has an Introduction, which contains information relevant to that system, and a Category of Impairments, which contains each numbered listing. Each listing describes the objective medical and other findings needed to satisfy the criteria of that listing. *Id*.; 20 C.F.R. § 404.1525.

hours at a time. Tr. 1386. Raney lifted 10 pounds to below waist height, five pounds to shoulder height, and carried 12 pounds. Tr. 1386. She could push or pull 15 pounds. Tr. 1386. Cecez wrote that Raney could occasionally bend, reach forward, squat, climb stairs, walk, pinch, and perform fine coordination and simple grasping. Tr. 1386. Cecez indicated that Raney should avoid reaching over her shoulder, dynamic and static balancing, firm grasping, and gross coordination. Tr. 1386. On March 22, Nurse Patterson wrote a letter and stated that she agreed with the results of Cecez's evaluation. Tr. 1388.

In May 2020, Raney had a telephone appointment with the Chronic Pain Rehabilitation Center. Tr. 2074. She presented as agitated and had loud and pressured speech. Tr. 2074. Raney stated that she thought that her Atarax was helping with her anxiety but she wasn't taking it consistently. Tr. 2074. Upon exam, Raney's thoughts were linear, her cognition was intact, and her insight and judgment were "fair at best." Tr. 2075. The provider adjusted Raney's anxiety medication and discussed non-pharmacologic techniques like mindfulness, distraction, low-impact exercise, yoga, and meditation. Tr. 2075. In June 2020, Raney had an individual counseling appointment at Coleman Counseling. Tr. 2641. Raney was cooperative and had clear speech and a constricted affect. Tr. 2642. Raney's cognitive impairment was unremarkable and Raney had normal thoughts. Tr. 2642.

In August 2020, Raney had a tele-health counseling session. Tr. 2613. Raney said that she was "not so bad today." Tr. 2613. Raney explained that her

mood was dependent upon her pain level and that she was feeling a little better with medication changes. Tr. 2613. Her mood had been "pretty good" and she was trying to do more things like cleaning and gardening. Tr. 2613. A visit from her niece and nephew had improved her mood. Tr. 2613.

In September 2020, Raney saw Salim Hayek, M.D., at University Hospitals for generalized body pain.[7] Tr. 2929. Raney described pain in her neck, back, and limbs. Tr. 2929. She reported anxiety and depression and a history of suicidal ideation. Tr. 2929. Upon exam, Raney had a normal gait, normal range of motion, full strength in her arms and legs, and normal sensation and reflexes. Tr. 2932. She had pain at various trigger points throughout her body. Tr. 2932. Raney's recent and remote memory "as evidenced through face-to-face interaction and discussion appear grossly intact" and Raney's mood and affect were normal. Tr. 2932. Dr. Hayek summarized that Raney had a history of fibromyalgia and visited that day for possible ketamine infusions to manage her fibromyalgia. Tr. 2933. Dr. Hayek wrote that Raney "denied numbness and tingling. Diagnosis likely continued chronic fibromyalgia." Tr. 2933. Dr. Hayek placed Raney on the ketamine infusion waiting list and explained that "the mainstay of managing

---

[7] The narrative portion of the treatment note states that Raney denied numbness, tingling, weakness, headaches, and bladder and bowel function. Tr. 2929. Directly under that paragraph is a "review of systems," in which Raney reported problems with bladder and bowel function, headaches, numbness, and tingling. Tr. 2929.

fibromyalgia is to participate in low-impact aerobic exercises" for an hour per day, six days a week. Tr. 2933.

In December 2020, Raney saw a physical therapist and an "assessment specialist" for a "KEY Functional Whole Body Assessment." Tr. 2887. The assessors wrote that Raney put forth full effort. Tr. 2892. They found that Raney could lift 17 pounds, reflecting that she could perform light work. Tr. 2893. They wrote that Raney could sit for 8 hours, one hour at a time; stand for one to two hours, 10 minutes at a time; and walk for two to three hours for "occasional moderate distances." Tr. 2893. She could occasionally or "minimally occasional[ly]" perform postural activities, move her head and neck, and use her hands for firm and fine grasping. Tr. 2893. She could frequently perform some simple grasping. Tr. 2893.

In February 2021, Raney's primary care provider, Dr. Jergovich, wrote a letter stating that she agreed with the results of Raney's December 2020 functional assessment. Tr. 2896. Dr. Jergovich also indicated that Raney would be off-task more than 15 percent of a work-day and absent more than two days per month. Tr. 2897.

Also in February 2021, Raney had a counseling session by telephone. Tr. 1935. She was doing "okay" and had been running errands that day. Tr. 1935. Raney reported that her back injections, which she had every two weeks, helped her pain and associated anxiety and depression. Tr. 1935.

13

In April 2021, Dr. Hayek provided Raney with a ketamine infusion. Tr. 2934.

In May 2021, Raney saw Dr. Jergovich for gastrointestinal issues. Tr. 3062. Dr. Jergovich's exam findings showed that Raney had a full range of motion of in her lumbar spine and no spinal tenderness, but she had increased tension "at bilateral erector spinae muscles." Tr. 3063. Raney had full strength in her arms and legs. Tr. 3063.

At a June 2021 counseling session, Raney stated that her medications were helping. Tr. 2036. Her mood was aggravated and her suicidal thoughts never went away. Tr. 2036.

Later that month, Raney had a follow-up with Dr. Jergovich. Tr. 3059. Raney said that she had been feeling well and that her pain had improved since she started with new pain management. Tr. 3059. She was "[a]ctive in acupuncture" and was having "a TENS unit applied." Tr. 3059.

In August 2021, Raney had a tele-health counseling appointment. Tr. 2018. Raney reported that her medication was helping "a little bit" but that she was not happy. Tr. 2018. Pain management "ebbs and flows" and the treatment "doesn't last as long as they hope." Tr. 2018. Her mood was affected by situational stressors. Tr. 2018. Upon exam, Raney had fair grooming and hygiene and was cooperative. Tr. 2021. She had normal eye contact and speech and a constricted affect. Tr. 2021. Raney had logical, racing thoughts; normal associations; and preoccupations about her physical health, disability,  and

14

suicidal thoughts. Tr. 2022. She reported that her focus was "continually interrupted by intrusive thoughts regarding trauma." Tr. 2022. Raney's insight and judgment was fair. Tr. 2022. Raney's diagnoses included unspecified bipolar and related disorder with anxious distress, moderate; generalized anxiety disorder exacerbated by medical complications; and unspecified trauma and stress-related disorder. Tr. 2023.

Two days later, Raney saw Dr. Vucetic. Tr. 3793. Depression screening showed that Raney had severe depression. Tr. 3793. Raney denied difficulty walking, problems with balance, and performing her activities of daily living. Tr. 3794. She reported lower neck pain. Tr. 3794. Upon exam, Raney had a normal cervical spine range of motion, but motion elicited "low cervical pain." Tr. 3795. Dr. Vucetic discussed with Raney radiofrequency ablation in her lower cervical spine. Tr. 3795.

In September 2021, Raney saw a nurse practitioner at the Cleveland Clinic Center for Comprehensive Pain Recovery for a follow-up appointment. Tr. 2988, 2990. Raney's prior visit was in May 2020. Tr. 2988. Raney stated that she was following-up for "a lot of psychiatric problems in addition to [her] pain. The pain program did a good job of managing both my pain and emotional problems." Tr. 2990. Raney stated that her then-current counselor and psychiatrist were "dropping the ball." Tr. 2990. The nurse referred Raney to

the "Mood Disorder [intensive outpatient treatment] for management."[8] Tr. 2991.

In early October 2021, Dr. Hayek indicated that Raney received ketamine infusions about once a month, which Raney described as "very helpful" and "wonderful." Tr. 2940–41. Raney also received cervical radiofrequency "lesioning" procedures from Dr. Vucetic, which were also "very helpful." Tr. 2940–41. She performed low-impact aerobic exercises daily, a half-hour at a time, and sometimes more than once a day. Tr. 2940. Raney denied numbness, tingling, weakness, and loss of bladder or bowel function. Tr. 2941.

In late October 2021, Raney saw Licensed Professional Clinical Counselor Thomas Supan for a diagnostic assessment at the Cleveland Clinic's intensive outpatient program. Tr. 2970. Supan wrote that Raney behaved appropriately during the assessment and had appropriate speech. Tr. 2974–75. Raney had a depressed mood and a full and appropriate affect. Tr. 2975. She was oriented and had intact and linear associations and appropriate insight and judgment. Tr. 2975. Supan's impression was anxiety disorder, chronic PTSD, mood disorder, and major depressive disorder, recurrent and severe without psychotic symptoms. Tr. 2979. Raney was admitted into the program. Tr. 2980.

---

8    Raney cites "T-Scores" for this visit, but those scores cited were from 2018 and 2019. Doc. 8, at 7 (citing Tr. 2991).

In November 2021, Raney saw Diana Lorenzo, M.D., for a virtual visit for the intensive outpatient program. Tr. 2949. Raney reported that the program had been helpful and that she was tolerating her medications. Tr. 2949. Dr. Lorenzo wrote that Raney was "slightly improved." Tr. 2949. Raney denied joint, back, and muscle pain; headaches; and incontinence. Tr. 2952. Raney's mental exam findings were unremarkable. Tr. 2952. Dr. Lorenzo continued Raney's medications and assessed a Global Assessment of Functioning score of 45."[9] Tr. 2953.

A week later, Raney saw Dr. Vucetic to discuss radiofrequency ablation. Tr. 3788. Raney denied depression. Tr. 3788. She reported neck pain and no difficulty performing her activities of daily living. Tr. 3788. Raney reported chronic knee pain that she saw an orthopedic surgeon for and stated that she wanted to pursue more aggressive treatment because her knee pain limited her ability to do things around the house. Tr. 3789. Raney suggested a "Sprint

---

[9]      Global Assessment of Functioning (GAF) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000, at 34. A GAF score between 41 and 50 indicates "serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, few friends, unable to keep a job)." *Id*. In 2013, the Fifth Edition of the Diagnostic & Statistical Manual of Mental Health Disorders was published and did not include the GAF. *See* American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013, at 16.

PNS," which she had read about.[10] Tr. 3789. Upon exam, Raney was pleasant, cooperative, and had a normal range of motion in her cervical spine, which caused "low cervical pain." Tr. 3789. She had pain with range of motion in her knees and swelling. Tr. 3789. Dr. Vucetic wrote that Raney continued to experience "excellent relief" from cervical spine ablations from July, and that those will be repeated "in [six] months or when pain returns." Tr. 3790. Dr. Vucetic planned to administer lower cervical branch blocks and, "if [Raney] continues to do well," they will proceed with thermal radiofrequency ablation. Tr. 3790. Dr. Vucetic agreed that Raney was "an excellent candidate for implantation" of a PNS system in her knees. Tr. 3790.

In December 2021, Raney saw Dr. Jergovich for a follow-up. Tr. 3053. Raney said that she had been feeling well. Tr. 3053. She was completing behavioral health therapy and felt like she was doing "much better." Tr. 3053.

In early March 2022, Collica completed another Mental Health Residual Functional Capacity questionnaire on Raney's behalf with generally the same limitations as Collica selected in her 2019 questionnaire. Tr. 2060–64.

In late March 2022, Dr. Vucetic responded to Raney's attorney's letter referencing the KEY Whole Body Assessment that was completed on Raney's behalf by other providers in December 2020. Tr. 3203. In response to a question

---

[10]    According to its website, the SPRINT PNS System "offers a minimally-invasive 60-day implant … designed to deliver" pain relief. *See* https://www.sprtherapeutics.com/sprint-pns-system/ [https://perma.cc/K826-JGJG].

about whether he agreed with the December 2020 whole body assessment and adopted its results, Dr. Vucetic checked "yes" and "no." Tr. 3203. Dr. Vucetic opined that Raney's conditions would cause Raney to be off-task more than 15 percent of a workday and absent least two days a month. Tr. 3203–04. Dr. Vucetic explained that Raney "suffers [from] severe chronic pain secondary to several different pathologies as well as mental illness which would impact her from maintaining employment[.] I do not think [the KEY Whole Body Assessment] is accurate I believe she is more disabled." Tr. 3204.

On March 30, 2022, Raney saw a physical therapist for an evaluation at the University Hospitals Rehabilitation Center. Tr. 3780. Raney reported chronic cervical, periscapular, and left arm pain that had progressively worsened and affected her ability to perform daily activities. Tr. 3780. Upon exam, Raney's arm strength was "3+/5 …, limited by complaint[s] of increased cervical and left [upper extremity] pain." Tr. 3781. Raney had significant tenderness and trigger points in her left upper trapezius and periscapular region. Tr. 3781. Her cervical range of motion was decreased. Tr. 3781. She had a positive Spurling's test, indicating cervical radiculopathy. Tr. 3781. On April 6, at Raney's third visit, Raney had increased cervical spine range of motion. Tr. 3785.

During this time period, Raney also received Botox injections for migraines. *See, e.g.*, 3781. She received trigger point injections. *See, e.g.*, Tr. 3781. And she had acupuncture. *See, e.g.*, Tr. 3059.

19

### 3. *Function report*

In April 2017, Raney completed a function report. Tr. 321–27. She alleged that her impairments caused difficulties in the following areas of functioning: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentrating, using her hands, and getting along with others. Tr. 325. She stated that she was "short tempered" due to pain and migraines and that pain kept her "homebound" most days. Tr. 325. Her anxiety and depression caused her to be withdrawn. Tr. 325. Raney indicated that she could follow written instructions if they were in front of her but she couldn't remember them. Tr. 325. Her ability to follow instructions also depended on the medication she had taken. Tr. 325. She could not follow spoken instructions well due to "chemo brain." Tr. 325. Raney got along "ok to fair" with authority figures, including bosses, and was never fired or laid off from a job due to problems getting along with others. Tr. 326. Raney described a typical day as staying in bed or on the couch, "mov[ing] as little as possible unless there is an app[ointment] [she] cannot miss and [she] force[s] [her]self to go." Tr. 321. Pain affected her sleep. Tr. 321. Raney did some chores and needed help lifting and carrying. Tr. 322.

4.    *State agency opinions*[11]

In August 2020, Lisa Foulk, Psy.D., reviewed Raney's record and found that Raney did not satisfy the criteria for Listings 12.04, 12.06, or 12.15. Tr. 1574–75. As to Raney's mental residual functional capacity (RFC),[12] Dr. Foulk found that Raney could perform simple, routine, and repetitive tasks but not at a production rate pace. Tr. 1577. Raney could have occasional interaction with co-workers, supervisors, and the public. Tr. 1577.

In October 2020, Kristen Haskins, Psy.D., agreed that Raney didn't meet a listing. Tr. 1591. As to Raney's RFC, Dr. Haskins opined that Raney could understand and remember simple, one-to-three step tasks and complete simple and short-cycle tasks in a setting without fast-paced demands. Tr. 1593–94. Raney could superficially interact with others. Tr. 1594. She could work within a set routine where major changes are explained in advance and gradually implemented to allow her time to adjust to the new expectations. Tr.

---

[11]    When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[12]    An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

1594. Raney had a reduced ability to handle routine stress and pressure, but she could handle tasks without strict time limitations or production standards. Tr. 1594.

In August 2020, Lynne Torello, M.D., reviewed Raney's record and assessed Raney's physical RFC. Tr. 1576. Dr. Torello opined that Raney could perform light work with reaching, handling, fingering, postural, and environmental limitations. Tr. 1576. In October 2020, Stephen Koch, M.D., agreed with Dr. Torello's findings. Tr. 1592.

5. *Hearing testimony*

Raney, who was represented by counsel, testified at the telephonic administrative hearing held in April 2022. Raney stated that she had pain throughout her body that had worsened since 2017. Tr. 1433. A lot of Raney's pain is in her cervical and thoracic spine and her knees. Tr. 1437. Raney estimated that in 2017 she could lift about 20 pounds and at the time of the hearing she could lift about five pounds. Tr. 1438. In 2017, she could stand for two hours and walk for 20 minutes, and at the time of the hearing she could stand for 30 to 45 minutes and walk for 10 minutes. Tr. 1438. In 2017, she could sit for two hours and at the time of the hearing she could sit for about 30 minutes. Tr. 1439.

To treat her pain, Raney takes 13 medications. Tr. 1439. She is enrolled in the Spine and Pain Institute and undergoes the treatment the Institute recommends. Tr. 1439. She had trigger point injections, radiofrequency

22

ablations in her neck, and injections in her knees. Tr. 1439. She has a "terrible time" managing the pain in her scapula and shoulder blades. Tr. 1439–40. Raney's treatment helps "for a little while" but then "it goes away." Tr. 1440. Raney's injections are supposed to last six months but Raney feels them wearing off after four months. Tr. 1440. Her medications help, but they cause side effects—sleepiness, nausea, and trouble focusing. Tr. 1441.

Raney stated that she also has mental impairments. Tr. 1441. She has depression, anxiety, PTSD, and suicidal ideation. Tr. 1441. Raney takes medication, which helps. Tr. 1441.

Raney explained that in 2017, she was having medical procedures due to her "bad pain flare" and recuperating from those procedures. Tr. 1444. At the time of the hearing, Raney's situation was the same—she experienced pain and recovered from procedures. Tr. 1444. Raney stated that it was a repeated pattern—Raney has treatment for one area and then another area flares up. Tr. 1444. Her therapy includes a TENS unit, acupuncture, physical therapy, and massage. Tr. 1444. Even after all that, Raney feels the pain creeping back the next day. Tr. 1444. Everything helped, but nothing lasts or cures her. Tr. 1444. Sometimes she had two medical appointment a week. Tr. 1453. Raney started receiving ketamine infusions about a year before the hearing. Tr. 1459.

Raney stated that in 2017, she could drive better and perform more chores than she could at the time of the hearing. Tr. 1444–45. Even so, in 2017, she had to take breaks. Tr. 1445. At the time of the hearing, Raney couldn't do

any chores at all. Tr. 1457. She does some stretching at home as part of her pain program exercises. Tr. 1447. Raney spends a lot of her day lying down. Tr. 1448. Raney lives with her mother and her mother does most of the chores and tells Raney what to help with. Tr. 1448.

The ALJ discussed with the vocational expert Raney's past relevant work as a sales clerk and a radiological technician. Tr. 1436. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Raney could perform Raney's past work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 1462–63. The vocational expert answered that such an individual could not perform Raney's past work but could perform the following jobs in the national economy: cleaner, price marker, and office helper. Tr. 1464. When asked about the customary tolerance for off-task behavior and absenteeism, the vocational expert stated that a person could be off-task no more than 10 percent of the workday and absent no more than once a month. Tr. 1465.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1.   The claimant meets the insured status requirements of the Social Security Act through June 30, 2022.
>
> 2.   The claimant has not engaged in substantial gainful activity since the alleged onset date, March 4, 2017, (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3. Since the alleged onset date, the claimant has had the following severe impairments: history of breast cancer status post double mastectomy, migraine headaches, chemotherapy induced peripheral neuropathy, fibromyalgia, degenerative disc disease of the lumbar spine, lumbar spondylosis, degenerative disc disease of the cervical spine, cervical spondylosis, cervical radiculopathy, osteoarthritis of the bilateral knees, depressive disorder, and posttraumatic stress disorder (20 CFR 404.1520(c) and 416.920(c)).

4. Since the alleged onset date, the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that since the alleged onset date, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb ramps and stairs and never climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crouch, and crawl. The claimant can frequently reach overhead with the bilateral upper extremities. She should avoid concentrated exposure to vibration. She can perform simple, routine one to three-step tasks in a setting free of fast-paced production requirements or strict production quotas in a set routine where major changes are explained in advance and gradually implemented. The claimant can have superficial interaction with supervisors, co-workers, and the general public, meaning that she should perform no work tasks that involve customer service duties, confrontation, conflict resolution, directing the work of others, persuading or influencing others, or being responsible for the safety or welfare of others (20 CFR 404.1567 and 416.967).

6. Since March 4, 2017, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. Prior to the established disability onset date, the claimant was an individual closely approaching advanced age. On March 12, 2022, the claimant's age category changed to an individual of advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Prior to March 12, 2022, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills. Beginning on March 12, 2022, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Prior to March 12, 2022, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. Beginning on March 12, 2022, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

> 12. The claimant was not disabled prior to March 12, 2022, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 1397–1409.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not

> disabled. If not, the ALJ proceeds to the next step.
>
> 5.   Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* Substantial evidence "is 'more than a mere

scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1.    The listings at step three*

Raney argues that the ALJ erred when she found that Raney didn't satisfy the criteria of Listing 12.04, *depressive, bipolar and related disorders*, and Listing 12.06, *anxiety and obsessive-compulsive disorders*. Doc. 8, at 13.

At step three of the disability evaluation process, a claimant will be found disabled if his or her impairments meet or equal one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears

the burden of establishing that any condition meets or equals a listing. *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727–28 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)). A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Id.* at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)). "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to 'meet' the listing." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). "[A] claimant is also disabled if her impairment is the medical equivalent of a listing[.]" *Id.* (emphasis in original). There is no heightened articulation standard at step three. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

Listings 12.04 and 12.06 contain three paragraphs—A, B, and C. To satisfy either listing, a claimant must satisfy the requirements in paragraphs A and B or paragraphs A and C. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00A2. To satisfy the paragraph B criteria, the claimant must have an "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning: understanding, remembering, and applying information; interacting with others; concentrating, persisting, and maintaining pace; and adapting and managing oneself. *Id.* at 12.00A2b. The ALJ found that Raney

had "moderate" limitations in the first three areas and a "mild" limitation in the last area. Tr. 1399. Raney argues that the ALJ erred when she found that Raney had no more than a *moderate* limitation in interacting with others and concentrating, persisting, and maintaining pace. Doc. 8, at 14–17.

For interacting with others, the ALJ found that Raney had a *moderate* limitation, explaining:

> The claimant noted some social isolation and she was agitated periodically, but the evidence did not document substantial ongoing behavioral problems. She maintained a relationship with her mother during the relevant period. She also noted that she got along adequately with authority figures (3E/7).

Tr. 1399. Raney argues that "there is no authority or reasoning as to why [Raney] having a relationship with her mother or one cite stating she gets along with authority, is sufficient reasoning for a moderate limitation." Doc. 8, at 14. To the contrary, Raney's self-reported ability to get along with authority figures and the fact that Raney maintained a relationship with her mother support the ALJ's evaluation of this area of functioning. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00E2 (describing examples of interacting with others as: "cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness.").

The ALJ also found that there was "no evidence … document[ing] substantial ongoing behavioral problems." Tr. 1399. The ALJ commented elsewhere in her decision that Raney regularly engaged with medical personnel in a manner described as "cooperative." Tr. 1401, 1402, 1404; *see also* Tr. 1407.[13] Raney argues that she "exhibited being easily agitated, frustrated/irritable and pressured or abnormal speech at several appointments." Doc. 8, at 15 (citing Tr. 2001, 2004, 2013, 2022, 2074, 2266, 2320, 2623, 2631, 2959, 2988, 3044).[14] Nevertheless, Raney was still described as cooperative, Tr. 2004, 2013, 2022. *See also* Tr. 805, 1068, 1131, 2597, 2608–09, 2021, 2641–42. Raney cites other pages of her function report in which she reported "issues with her anxiety handling stress, having meltdowns with changes in routine and worrying about everything due to her anxiety being

---

[13]    Raney concedes that the ALJ is permitted to "cite evidence elsewhere in the decision to support her argument at Step 3." Doc. 8, at 15; *see Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion."); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

[14]    Transcript pages 2001 and 2004 are from the same visit, in which Raney was agitated and restless and had pressured speech. Tr. 2004. She had been out of her medication for two months. Tr. 2001. Transcript page 2022 shows that Raney was cooperative and did not exhibit abnormal speech or agitation. Transcript pages 2074, 2988, and 3044 are the same May 7, 2020 visit. Raney was agitated and had loud, pressured speech during a telephonic office visit, but also stated that her anxiety medication was helping but that she wasn't taking it consistently. Tr. 2074, 2988, 3044. Transcript page 2959 shows no exam findings. Transcript pages 2266 (Raney was "very engaged" and making "great progress") and 2320 (Raney was "fully engaged") are group or family counseling notes.

very high." Doc. 8, at 15. But Raney doesn't explain how that undercuts the ALJ's finding that, despite Raney's periodic agitation, there was no "document[ed] substantial ongoing behavioral problems" or the ALJ's conclusion that Raney has a *moderate* limitation in interacting with others. Tr. 1399. Finally, Raney argues that Counselor Collica and Nurse Patterson opined that Raney had at least a *marked* limitation in interacting with others. Doc. 8, at 15–16. But the ALJ discounted those opinions, Tr. 1405, as explained below.

Next, Raney argues that the ALJ erred when she found that Raney had a *moderate* limitation in concentrating, persisting, or maintaining pace. Doc. 8, at 16–17. The ALJ explained that Raney had a *moderate* limitation in this area of functioning because, despite "difficulty concentrating and … impaired focus at times during the relevant period, … she had otherwise normal cognitive functioning" and "was able to handle her finances, an activity that can require heightened levels of attention." Tr. 1399. Raney argues that the ALJ ignored objective evidence showing that Raney had "abnormal and/or impaired concentration, along with abnormal behavior, perseverations, racing thoughts or even preoccupations[.]" *Id*., at 16. But the ALJ recognized that Raney at times had impaired concentration, Tr. 1402–03, preoccupation, Tr. 1401–03, racing thoughts, Tr. 1401, and, in March 2019, dysregulated and disinhibited behavior, Tr. 1402. And the ALJ explained that, despite Raney's "variable symptoms, including limited focus, the balance of the exams showed

33

logical thoughts, appropriate behavior, intact memory, and adequate insight and judgment." Tr. 1407. In other words, the ALJ acknowledged Raney's abnormal exam findings, weighed the evidence, and concluded that Raney had a *moderate* limitation in concentrating, persisting, or maintaining pace.[15]

Raney argues that the ALJ's statement that Raney had stable exam findings in in the fall of 2021 was "false." Doc. 8, at 16 (citing 1403). Raney doesn't explain what about the ALJ's statement is false. Raney's exam findings in October 2021 showed that Raney had logical and racing thoughts, normal associations, and fair insight and judgment. Tr. 2030–31. In November 2021, Raney had logical thoughts, normal associations, and fair insight and judgment. Tr. 2038–39. At both visits she had preoccupations and reported impaired focus, which were both described as "unchanged." Tr. 2030–31; 2038–39. So Raney hasn't shown that the ALJ's characterization of that evidence as "stable" is false. And Raney's reliance upon Collica's and Patterson's opinion, Doc. 8, at 16, fails because, as explained below, the ALJ discounted that opinion, Tr. 1405.

Finally, Raney argues that the ALJ erred when she found that Raney didn't satisfy the paragraph C criteria. Tr. 1399. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00A2. To satisfy the paragraph C criteria, a claimant must show that she suffers from a "serious and persistent" mental disorder; she relies, "on

---

[15]    Raney asserts that she had impaired concentration all the time. Doc. 8, at 16. But the ALJ cited a record showing that Raney did not show impaired concentration. Tr. 1401 (citing Tr. 1131).

an ongoing basis, upon medical treatment … or a highly structured setting[], to diminish the symptoms and signs of [her] mental disorder; *and* that "despite … diminished symptoms and signs, [the claimant] ha[s] achieved only marginal adjustment." *Id.* at 12.00G2.

The ALJ wrote that Raney "had counseling at times during the relevant period, but she did not have a highly structured environment. Furthermore, the record did not establish that she had only marginal adjustment." Tr. 1399. Raney argues that the ALJ "failed to provide any support from the record or any evidence to support this finding." Doc. 8, at 17. Raney submits that she has a "serious and persistent mental disorder" and lived in a "highly structure environment" because she lived with her mother "to assist with household responsibilities." Doc. 8, at 17. Even so, Raney hasn't shown that the ALJ's finding that "the record did not establish that [Raney] had only marginal adjustment," Tr. 1399, is erroneous.[16] Raney lists her treatment and states,

---

[16]     A claimant achieves only marginal adjustment:

> when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports (see 12.00D). Such deterioration may have necessitated a significant change in medication or other treatment. Similarly, because of the nature of your mental disorder, evidence may document episodes of deterioration that have required you to be hospitalized or absent from work, making it difficult for you to sustain work activity over time.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00G2c.

"[d]espite all of these interventions, [Raney's] providers consistently indicated she suffered from serious, severe and even extreme functional limitations due to her pain and depression" and asserts that the ALJ didn't analyze those treatments. Doc. 8, at 17–18. But elsewhere in the decision, the ALJ discussed Raney pain treatments and physical and mental health therapy. Tr. 1401–04. The ALJ concluded that Raney's pain treatments helped and that Raney maintained "logical thoughts, appropriate behavior, intact memory, and adequate insight and judgment." Tr. 1407. That explanation is sufficient to support the ALJ's finding that, despite treatment, Raney hadn't shown only marginal adjustment. *See Crum*, 660 F. App'x at 455 (reversal is unwarranted when the ALJ's conclusion is sufficiently supported by factual findings elsewhere in decision); *Bledsoe*, 165 F. App'x. at 411 (no heightened articulation standard at step three).[17]

    In sum, substantial evidence supports the ALJ's step three findings and Raney hasn't shown that the ALJ erred.

---

[17]    Raney relies on *M.G. v. Comm'r Soc. Sec.*, 861 F.Supp.2d 846 (E.D. Mich. 2012), for her argument that an ALJ's failure to articulate findings at step three is reversable error. Doc. 8, at 14, 18. But in that case, the ALJ only stated that the claimant's Asperger Syndrome didn't meet any listing without identifying what listings he evaluated. *Id*. at 857–58. The ALJ referenced a state agency reviewer's opinion, but that reviewer hadn't identified a listing, either. Here, the ALJ identified the specific listings that she evaluated and explained why she found that Raney didn't satisfy them. Tr. 1399.

2.    *Opinion evidence*[18]

Raney contends that the ALJ failed to appropriately analyze Raney's "treating providers' opinions." Doc. 8, at 18.

Raney first asserts that the ALJ detailed a February 2019 physical therapist's functional capacity evaluation and then the ALJ wrote, "The findings were adopted by Mary Patterson, CNP." *Id*.; Tr. 1405. Raney complains that the ALJ "only noted that Mary Patterson adopted the FCE 2019 findings …. The ALJ never specified that Ms. Patterson adopt[ed] the FCE findings, constitutes as her opinion[.]"[19] *Id*. But the fact that the ALJ didn't call the "findings" in the functional capacity evaluation an "opinion" doesn't mean that she didn't consider it an opinion. *See* Tr. 1405 (ALJ explaining why

---

18    The parties agree that, because Raney's application was filed before March 27, 2017, the regulations that governed at that time apply in this case. Doc. 8, at 21; Doc. 18, n 6; *see* 20 C.F.R. 404.1520c ("[f]or claims filed before March 27, 2017, the rules in § 404.1527 [regarding opinion evidence and the treating physician rule] apply"). The regulations I cite are the versions in effect before March 27, 2017.

19    In her brief, Raney says, "The ALJ never specified that *Ms. Patterson adopting the FCE findings, constitutes as her opinion*; despite this and *her conclusory argument*, Plaintiff underwent significant treatment for her pain and physical limitations, but she did not improve." Doc. 8, at 18. This sentence is less than clear. I think that Raney is saying in the first clause that *because* Patterson adopted the FCE findings, those findings constitute her opinion. The phrase *her conclusory argument* is, however, less clear. Raney is the only person who made an argument before the agency. And the pronoun *her* seems to relate to the noun *Plaintiff*, which is the subject of the independent clause that makes up the second half of the sentence. But I doubt that Raney is describing her own argument as conclusory. So I don't know who made the conclusory argument.

she gave "little" weight to the limitations assessed in the functional capacity evaluation).

Next, Raney says that the ALJ "was still required to go through the factors" under Social Security Ruling 06-3p when evaluating the 2019 evaluation. Doc. 8, at 18. *See also* 20 C.F.R. § 416.927(c). When considering "any medical opinion," the ALJ considers these factors: examining relationship; treatment relationship; length of treatment relationship and frequency of examination; the nature and extent of the treatment relationship; supportability; consistency; specialization; and other factors. *Id*. at 416.927(c)(1)–(6); Soc. Sec. Ruling 06-3p, 2006 WL 2329939, at *3–4 (S.S.A. 2006). Because Nurse Patterson is not an "acceptable medical source," the ALJ is not required to give "good reasons" for the weight she assigns to Patterson's opinions. *See* 20 C.F.R. § 416.927(c)(2); *Handzel v. Comm'r of Soc. Sec.*, No. 1:13-cv-01779, 2014 WL 2611858, at *4 (N.D. Ohio June 11, 2014). But the ALJ "generally should explain the weight" that she gives to non-acceptable medical opinions like Patterson's. Soc. Sec. Ruling 06-3p, 2006 WL 2329939, at *5; *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th Cir. 2014). "Still, 'so long as the ALJ addresses [the 'other source's' opinion] and gives reasons for crediting or not crediting the opinion, the ALJ has complied with the regulations." *Hirko v. Colvin*, No. 1:15-cv-580, 2016 WL 4486852, at *3 (N.D. Ohio Aug. 26, 2016) (quoting *Drain v. Comm'r of Soc. Sec.*, No. 14-cv-12036, 2015 WL 4603038, at

*4 (E.D. Mich. July 30, 2015) (in turn citing *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011)).

Here, the ALJ addressed Patterson's opinions and gave reasons for not crediting the opinions. *See Hirko*, 2016 WL 4486852, at *3. The ALJ discussed the findings in the physical capacity evaluation—Raney could only sit and work for five hours and 15 minutes a day, lift less than 10 pounds, and carry 12 pounds—and assigned the opinion "little" weight, explaining:

> While the claimant demonstrated substantial dysfunction [at the evaluation], contemporaneous treatment notes showed generally normal strength, reflexes, and gait. Moreover, the claimant's pain was generally stable and had improved with recent pain rehabilitation treatment. Such facts suggest that the functional capacity evaluation findings were outliers from the balance of the evidence and the claimant could perform light work generally.

Tr. 1405. As for Raney's mental functional capacity, the ALJ wrote that Patterson opined that Raney could have little change, low stress, no production quotas, and social limitations. Tr. 1405. Patterson found that Raney had extreme limitations in all of the paragraph B criteria and satisfied the paragraph C criteria of the listings. Tr. 1405. the ALJ gave this opinion "little" weight because:

> the records did not document such significant mental dysfunction. Indeed, while the claimant had ongoing mood, anxiety, and trauma symptoms, she had only periodic focus deficits with largely logical thoughts, normal memory, appropriate behavior, and intact insight and judgment. Such findings are inconsistent with the degree of limitations the providers described.

Tr. 1405.

39

Raney doesn't directly attack the ALJ's reasoning. Rather, Raney summarizes her treatment that she received in August 2018. Doc. 8, at 19. Raney argues that the ALJ's recitation elsewhere in the decision of the evidence from August 2018 "failed to include Plaintiff's signs that her affect was depressed and varied from jocular to tearful[.]" Doc. 8, at 19 (citing Tr. 1401). But the ALJ wrote that Raney in August 2018 "appeared depressed with variable affect." Tr. 1401. Raney asserts that the ALJ failed to write that Raney's "speech was spontaneous but at times tangential." Doc. 8, at 19. But she ignores the fact that the ALJ wrote that Raney had "tangential thoughts." Tr. 1401. Raney says that the ALJ failed to state that Raney had "moderate somatic preoccupation." Doc. 8, at 19. But the ALJ wrote that Raney had "moderate preoccupation and poor eye contact." Tr. 1401.

Raney argues that the ALJ didn't mention Raney's "Pain Disability Index score suggesting severe functional impairment" referenced in that August 2018 treatment note. Doc. 8, at 19. But the ALJ is not required to cite every piece of evidence, and every item in every piece of evidence, in the record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). That same rule applies to Raney's complaint that the ALJ "missed several objective measurements regarding [Raney's] tenderness, pain, abnormal range of motion and overall limitations in her cervical and thoracic spine." Doc. 8, at 19 (citing Tr. 1170). The ALJ acknowledged that Raney had spinal tenderness, a limited range of motion in her spine, and walked with a "mildly altered gait

and used a cane." Tr. 1401. The ALJ also commented that Raney had "decreased upper extremity strength" in an early August therapy evaluation and "intact upper extremity strength" and intact sensation later that month. Tr. 1401. The fact that the ALJ didn't recite the precise details of Raney's spinal range of motion and strength findings in that treatment note, and duplicate findings at later visits in August 2018, Doc. 8, at 19, is not error.

Raney argues that "[d]espite the ALJ's understanding that [Raney's] strength improved and she had much better control of her pain (Tr. 1401), the record states otherwise." Doc. 8, at 19–20 (citing Tr. 1361, Raney's November 2018 follow-up visit with Patterson). Not so. Patterson's November 2018 treatment note states that Raney's pain was "in much better control." Tr. 1362. And the ALJ's finding—that "contemporaneous treatment notes showed generally normal strength"—is accurate. Tr. 1405; *see also* Tr. 1402 (ALJ citing a February 2019 treatment note showing that Raney had full strength, a normal gait, and negative straight leg raise testing). In short, Raney hasn't shown that the ALJ's evaluation of Patterson's opinions are erroneous.

Raney also challenges the ALJ's evaluation of Dr. Vucetic's opinion. Doc. 8, at 20–23. Dr. Vucetic is Raney's treating physician. The parties agree that the ALJ should have, but did not, apply the "treating physician rule" when she evaluated Dr. Vucetic's opinion. Doc. 8, at 20; 10, at 23. Under 20 C.F.R. § 416.927(c)(2), known as the *treating physician rule*, the ALJ must give a treating source opinion controlling weight if the opinion is "well-supported by

41

medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."[20] 20 C.F.R. § 416.927(c)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If the ALJ doesn't give controlling weight to a treating physician's opinion, the ALJ weighs the factors in 20 C.F.R. § 416.927(c)(1)–(6): the examining relationship; treatment relationship; length of treatment relationship and frequency of examination; the nature and extent of the treatment relationship; supportability; consistency; specialization; and other factors. "The ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide 'good reasons' for both her decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017), *aff'd sub nom. on other grounds, Biestek v. Berryhill*, 139 S. Ct. 1148 (2019); 20 C.F.R. § 416.927(c)(2).

Dr. Vucetic rendered his opinion in March 2022. Tr. 3203. It was based on his evaluation of Raney's "KEY Whole Body Assessment" performed in December 2020. Tr. 3203–23. The ALJ considered those items as follows:

> In a 2020 functional capacity assessment, the claimant was able to lift seventeen pounds consistent with light work, sit for eight hours, stand for one to two hours, and walk for two to three hours in a workday (26F). The claimant demonstrated additional postural and upper extremity limitations (26F/7). Brittney Jergovich, D.O. adopted the findings of the functional capacity evaluation (27F/1, 2). Dr. Jergovich added that the claimant would be

---

[20]    The *treating physician rule* applies to this case because Raney filed her application before March 27, 2017. *See* 20 C.F.R. 404.1520c.

absent from work two days per month (27F/2). The undersigned assigns little weight to the functional capacity findings. Such findings were based on a one-time assessment and the balance of the treatment notes did not establish such limitations. Indeed, there was little indication of the substantial hand dysfunction described in the evaluation. Additionally, the claimant had generally normal gait, strength, and sensation, which findings are inconsistent with the functional capacity evaluation assessment. Moreover, there was no explanation of why the claimant would miss two days of work per month.

Henry Vucetic, M.D. also adopted the findings of the functional capacity assessment, but he did not believe they were an accurate reflection of the claimant's limitations since March 2017 (33F/2). Dr. Vucetic said that he believed the claimant would be off task more than fifteen 15% of the workday and she would miss work at least two days per month (33F/2). The undersigned finds Dr. Vucetic's opinion unpersuasive. As described above, the record suggested that the claimant was capable of more than described in the functional capacity evaluation. Moreover, Dr. Vucetic made conclusory statements about being off-task and absent regularly with little specific discussion of why the claimant would miss work and be off-task excessively.

Tr. 1406.

The Commissioner argues that the ALJ gave *good reasons* for rejecting Dr. Vucetic's opinion and that "substantial evidence supports the ALJ's finding as to the opinions notwithstanding the ALJ's use of the incorrect term [that the opinion was *unpersuasive*]." Doc. 10, at 22. The Commissioner submits that treating physician rule violations are harmless "if the ALJ has met the goals of the procedural requirement—to ensure adequacy of review and to permit the

43

claimant to understand the disposition of the case—even though he failed to comply with the regulatory terms." *Id.* (citing *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440 (6th Cir. 2010) and *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004)). While it is true that treating physician rule violations may be harmless in certain cases, Raney's case is not one of those cases.

The Commissioner points out that Dr. Vucetic's opinion contained an "ambiguity" as to whether or not Dr. Vucetic adopted the findings in the 2020 evaluation. Doc. 10, at 22. That may be so, *see* Tr. 3203, but the ALJ had no trouble interpreting Dr. Vucetic's responses to the 2020 evaluation and expressed no confusion about what Dr. Vucetic adopted. Tr. 1406. So an "ambiguity" is not a reason the ALJ cited to reject Dr. Vucetic's opinion. *C.f. Coldiron*, 391 F. App'x at 440 (treating physician rule violation was harmless when the ALJ accurately pointed out internal inconsistencies and vagueness in the treating physician's opinion). The Commissioner's argument that Dr. Vucetic "goes on to provide his own limitations … [that] only consist of broad, conclusory statements," Doc. 10, at 22, fails for the same reason; the ALJ didn't cite "broad, conclusory statements" as a reason to reject the narrative portion of Dr. Vucetic's opinion.[21] Tr. 1406; Tr. 3204.

---

[21]    The ALJ cited Dr. Vucetic's "conclusory statements about being off-task and absent," Tr. 1406, but didn't reference the narrative portion of Dr. Vucetic's opinion, Tr. 3204.

That leaves the ALJ's comment that "the record suggested that [Raney] was capable of more than described in the functional capacity evaluation." Tr. 1406. That statement does not meet the goal of 20 CFR § 416.927(c)(2). *See Wilson*, 378 F.3d at 547 (harmless error may exist when the ALJ met the goal of "the procedural safeguard of reasons" in section 416.927(c)(2)).[22] First, the ALJ didn't identify Dr. Vucetic as Raney's treating physician at the Spine and Pain Institute or mention Dr. Vucetic anywhere else in the decision, so it's not clear whether the ALJ even recognized that Dr. Vucetic treated Raney's chronic pain over a four-year period with regular trigger point injections and radiofrequency ablations. *See* 20 CFR § 416.927(c)(2), (2)(i)–(ii), (5) (the ALJ considers the length, nature, extent of the treatment relationship, and specialization of the physician).

Next, the ALJ's statement that Raney "was capable of more than described in the functional capacity evaluation" is not sufficiently explained. Neither is the ALJ's rejection of the underlying 2020 evaluation, in the event that analysis could be bootstrapped to the ALJ's analysis of Dr. Vucetic's opinion. The ALJ stated that findings were based on a one-time assessment and "the balance of the treatment notes did not establish such limitations." Tr. 1406. But unlike the ALJ's explanation of the 2019 evaluation, there is nothing in that statement from which one could understand how the ALJ arrived at

---

[22]  *Wilson* cites the version of the regulations that were in effect in 2004, which are the same in substance but contained a different numbering system than the version in effect when Raney filed her applications.

her conclusion rejecting the findings in the 2020 evaluation. So the ALJ didn't meet the goal of 20 CFR § 416.927(c)(2), and the ALJ's failure to apply the treating physician rule to Dr. Vucetic's opinion is not harmless.

3.     *Treatment modalities*

Raney argues that the ALJ "erred by not accurately accounting for all of the treatment interventions that plaintiff underwent for her pain." Doc. 8, at 23 (citing trigger point injections, radiofrequency denervation, Botox injections, and "Intensive Outpatient psychiatric care for comprehensive pain recovery"). The ALJ acknowledged that Raney had repeated trigger point injections, radiofrequency denervation, acupuncture, and Botox injections to control her pain and that Raney had psychiatric care. Tr. 1401–03. Raney asserts that she underwent more than 80 "pain procedures or therapies throughout the relevant time period." *Id*. at 24. But Raney doesn't make a specific argument about the relevance of the number of treatments she received. She doesn't provide a chronology of the dates of her treatments. The ALJ recognized Raney's extensive treatment history and regular treatments. Tr. 1401–03. So Raney has not shown that the ALJ failed to consider her treatment modalities.

**Conclusion**

For the reasons explained above, I recommend that the Court reverse the Commissioner's decision and remand for proceedings consistent with this opinion.

Dated: June 22, 2023

 */s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).